# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| RODOLFO RUEDA, JR. | ) | CASE NO. 1:17cv1878 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Rodolfo Rueda, Jr., ("Plaintiff" or "Rueda"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI  of the Social

Security Act, 42 U.S.C. §§ 416(i), 423 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to

an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the

reasons set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be VACATED and the case be REMANDED for further proceedings consistent with

this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.  PROCEDURAL HISTORY

In April 2014, Rueda filed an application for POD, DIB, and SSI alleging a disability onset date of October 15, 2013 and claiming he was disabled due to neck and back pain, "fluid volume," colitis, depression, and an enlarged liver.  (Transcript ("Tr.") 380, 382, 405.)  The applications were denied initially and upon reconsideration, and Rueda requested a hearing before an administrative law judge ("ALJ").  (Tr. 301, 310, 319, 326, 331.)

On June 8, 2016, an ALJ held a hearing, during which Rueda, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 215-242.)  On September 14, 2016, the ALJ issued a written decision finding Rueda was not disabled.  (Tr.8-31.)  The ALJ's decision became final on July 13, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On September 7, 2017, Rueda filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 14, 16.)  Rueda asserts the following assignments of error:

I.   The ALJ's decision was not based on the record as a whole and lacked the support of substantial evidence.

    A.   The ALJ failed to properly evaluate Mr. Rueda's fibromyalgia and conversion disorder.

    B.   The ALJ failed to properly consider Mr. Rueda's multiple hospitalizations.

II.  The ALJ's failed to properly evaluate the medical opinions of the treating physicians and her findings were not supported by substantial evidence.

    A.   The ALJ failed to properly evaluate the opinion of Dr. Nair, the treating pain specialist.

    B.   The ALJ failed to properly evaluate the medical opinion of Dr. Syed, the treating neurologist.

2

III.　　　　The RFC did not accurately portray Mr. Rueda and the ALJ
　　　　failed to include all of his functional limitations from both
　　　　his severe and non-severe impairments.

(Doc. No. 13.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Rueda was born in December 1968 and was 47 years-old at the time of his administrative

hearing, making him a "younger" person under social security regulations.  (Tr. 11, 243.)  *See* 20

C.F.R. §§ 404.1563(c).  He has a high school education and is able to communicate in English.

(Tr. 222.)  He has past relevant work as a janitor, die setter, machine operator, inspector hand

packager, and a job coach.  (Tr. 23.)

### B.   Medical Evidence[2]

From November 5 to November 8, 2013, Rueda was hospitalized for intractable

abdominal pain.  (Tr. 1197.)  His abdominal examination was normal and his abdominal

ultrasound was significant only for a mild fatty infiltration.  (*Id*.)  His symptoms resolved with

medications and he was discharged.  (*Id*.)

Rueda was again hospitalized from November 11 to November 13, 2013 for right flank

pain, vomiting, and diarrhea.  (Tr. 740.)  He reported recurrent abdominal pain for the past

several months.  (Tr. 743.)  During his hospitalization, he consulted with Edward S. Feldman,

M.D., a gastroenterologist.  (Tr. 746.)  Dr. Feldman determined the etiology of Rueda's

abdominal pain was unclear.  (*Id*.)  Rueda's urine drug screen was positive for cocaine, so he was

---

[2]　　　The Court's discussion is not intended to be exhaustive and covers only that
　　　medical evidence identified by the parties in their Briefs.

3

tapered off narcotics.  (Tr. 747.)  He was discharged in improved condition.  (Tr. 761.)

On December 12, 2013, Rueda required another hospitalization for abdominal pain and shortness of breath.  (Tr. 712.)  His liver ultrasound indicated mild biliary duct dilation.  (Tr. 717.)  During his visit, Rueda consulted with Marina Magrey, M.D., a rheumatologist.  (Tr. 719.)  Dr. Magrey concluded Rueda possibly had fibromyalgia and prescribed Neurontin.  (Tr. 721.)

From December 28 to December 30, 2013, Rueda was hospitalized for chest and abdominal pain.  (Tr. 677.)  An abdominal CT scan indicated a mild, non-specific small bowel dilation, which did not require any surgical intervention.  (Tr. 686.)  His labwork was again positive for cocaine.  (Tr. 703.)  The etiology of Rueda's gastroparesis was unclear and he was discharged in improved condition.  (Tr. 702-703.)

This pattern of repeated emergency room visits and hospitalizations continued into 2014. Rueda visited the emergency room three times in January 2014 for abdominal pain.  (Tr. 658, 635, 621.)  The hospital physicians noted Rueda had a "very extensive abdominal workup," but the etiology of his symptoms was not identified.  (Tr. 640.)

On February 21, 2014, Rueda visited pain management physician Preeti Gandhi, M.D. for neck, lower back, abdominal, hand, and shoulder pain.  (Tr. 542.)  He characterized his pain as sharp, burning, and continuous.  (*Id*.)  Rueda reported six weeks of sobriety from cocaine, despite a positive urine screen.  (*Id*.)  Dr. Gandhi told Rueda due to his cocaine usage he would not be a candidate for opioid therapy.  (*Id.*)  On examination, Rueda had a limited range of motion in his cervical and lumbar spine and altered sensation over both arms.  (Tr. 545.)  His lumbar spine x-ray revealed degenerative changes.  (*Id.*)  Dr. Gandhi noted Rueda had recently expressed suicidal ideation and recommended he seek treatment at the chronic pain rehabilitation program

4

at the Cleveland Clinic.  (Tr. 546.)

Rueda visited the emergency room on February 27, 2014 for abdominal pain, vomiting, and diarrhea.  (Tr. 526.)  The emergency room doctors identified no "acute emergent [abdominal] catastrophe," but did note some possible opioid seeking behavior.  (Tr. 529.)  Rueda received Zofran and was discharged.  (Tr. 530.)

On March 6, 2014, Rueda began a course of physical therapy for neck pain with Jacqueline Graham, PT.  (Tr. 489.)  Ms. Graham reviewed x-rays from January 2014, which revealed minor degenerative changes in the cervical spine.  (Tr. 491.)  On examination, Rueda had a decreased range of motion in his cervical spine.  (Tr. 492.)

On March 14, 2014, Rueda visited the MetroHealth emergency room for chest pain, dizziness, and diarrhea.  (Tr. 508.)  The emergency room physicians concluded the pain was unlikely cardiac in nature and a history of negative abdominal evaluations.  (Tr. 512.)  That same day, Rueda visited a different emergency room, at St. John Medical Center, reporting abdominal pain.  (Tr. 1188.)  This time, he was hospitalized for four days.  (*Id.*)  He underwent a endoscopy, which was negative, and a colonoscopy, which revealed some hemorrhoids.  (*Id.*)

Rueda returned to the MetroHealth emergency room on March 26, 2014 for abdominal pain.  (Tr. 495.)  His abdominal CT scan was negative for any acute process.  (Tr. 498.)  The emergency room physicians noted Rueda's reported pain was somewhat out of proportion to his examination.  (*Id.*)  They prescribed Pepcid and Tylenol.  (*Id.*)  That same day, Rueda visited St. John Medical Center with the same complaints.  (Tr. 1332.)  On examination, his abdomen was soft, tender, and non distended.  (Tr. 1334.)  His CT scan indicated a slight thickening in the colon.  (Tr. 1336.)  The emergency room doctors prescribed Cipro and Flagyl.  (*Id.*)

5

In April 2014, Rueda visited the emergency room three times for abdominal pain. (Tr. 479, 860, 1173.) A CT scan of his abdomen revealed borderline dilatation of the ascending colon. (Tr. 862.) From April 23 to May 3, 2014, Rueda required hospitalization for abdominal pain, dizziness, nausea, and vomiting. (Tr. 1173.) His stool was positive for clostridium difficile (a bacterial infection in the colon), and he required medications for this infection. (*Id.*) His diarrhea improved and he was discharged. (*Id.*)

Rueda returned to the emergency room on May 18, 2014 for abdominal pain and diarrhea. (Tr. 1309.) On examination, he had mild abdominal tenderness, but normal bowel sounds with no abdominal distention. (Tr. 1311.) His labwork was normal, but his CT scan revealed mild colitis. (Tr. 1312.) The emergency room physicians provided him with Bentyl and Flagyl. (*Id.*)

From July 29 to July 30, 2014, Rueda was hospitalized for left-sided chest pain. (Tr. 864.) As Rueda was not exhibiting any angina, the pain was determined to be likely musculoskeletal in nature. (*Id.*)

Rueda was hospitalized again from August 11 to August 19, 2014, after losing consciousness and falling down a flight of stairs. (Tr. 1140, 1670.) During his hospital stay, he consulted with a neurologist and underwent an EEG, which was normal. (Tr. 1198, 1141.) He also developed acute dizziness, which improved with medication. (Tr. 1141.)

On August 21, 2014, Rueda returned to the emergency room for a headache and neck pain. (Tr. 1269.) On examination, his sensation and motor skills were normal. (Tr. 1272.) A CT scan of his brain was negative and his cardiac workup was unremarkable. (*Id.*)

Rueda visited Natwarial Jethva, M.D., an internal medicine physician, on August 26, 2014. (Tr. 1670.) He reported dizziness and repeated falls for the past several weeks. (*Id.*) He

6

denied any drug use, despite a positive urine screen.  (*Id*.)  On examination, his gait and lumbar range of motion were normal.  (Tr. 1672.)

Rueda also visited neurologist Hayder Kadhim, M.D., on August 26, 2014.  (Tr. 876.)  He reported dizzy spells, repeated falls, and nausea.  (*Id*.)  He described several episodes of transient loss of consciousness.  (*Id*.)  He denied the use cocaine for the past 7-8 months.  (*Id*.)  On examination, Rueda did not require an assistive device for ambulation and his motor power and sensation were normal.  (*Id*.)  His neurological examination was nonfocal and his urine screen was positive for cocaine.  (Tr. 877, 1678.)  Dr. Kadhim recommended an EEG and MRI.  (Tr. 877.)  An August 26, 2014 brain MRI was normal, with no evidence of an acute intracranial process.  (Tr. 1683.)

From August 28 to September 3, 2014, Rueda was hospitalized after falling during a dizzy spell.  (Tr. 1643, 1066.)  His brain MRI indicated no changes.  (Tr. 1066.)  Rueda sustained another fall during the hospitalization.  (*Id*.)  He began physical therapy to address his dizziness and falls and was provided with a rolling walker.  (*Id*.)

Following this hospitalization, Rueda resided in a nursing home for several weeks for physical therapy.  (Tr. 1644, 1646.)  During his time at the nursing home, Dr. Jethva visited him for treatment.  (Tr. 972.)  Rueda indicated he still felt dizzy "all the time."  (*Id*.)  His physical examination was overall normal, but he did have some generalized weakness.  (Tr. 973.)  Dr. Jethva noted the etiology of his dizziness remained undetermined.  (Tr. 972.)

On September 25, 2014, Rueda visited the emergency room for a headache, dizziness, and nausea.  (Tr. 838.)  A head CT scan was normal and he was discharged home.  (Tr. 841, 842.)  Rueda returned to the emergency room on October 24, 2014, reporting facial swelling and pain.

7

(Tr. 842.)  A CT scan of his facial bones indicated remote nasal bone fractures.  (Tr. 846.)  The emergency room physicians provided Rueda with Ultram and recommended he follow up with his doctor.  (Tr. 847.)

On November 3, 2014, Rueda presented to the emergency room with chest pain and dizziness.  (Tr. 1127.)  He was ambulating with a walker.  (Tr. 1130.)  A chest x-ray revealed increased interstitial markings in his lungs, so he was admitted overnight for observation.  (Tr. 1134.)  The emergency room physicians noted Rueda had undergone a cardiac catheterization in May 2014, which was negative for coronary artery disease.  (Tr. 1136.)  The doctors concluded Rueda's chest pain was non cardiac in nature and possibly related to the arthritis in his cervical spine.  (Tr. 1137.)

Rueda first visited Tanvir Syed, M.D., a neurologist, on November 24, 2014.  (Tr. 1397.)  He reported several episodes of "passing out" and body tremors since his fall in August 2014.  (*Id*.)  He also indicated pain in multiple areas of his body, memory loss, and the need for a walker.  (*Id.*)

On examination, Rueda displayed "hysteric weakness" of the legs and feet, as he was not able to mount any resistence against Dr. Syed's hands, despite being able to stand on his heels and toes without difficulty.  (Tr. 1399.)  Rueda's dizziness during testing also appeared "dramatic."  (*Id*.)  His recent and remote memory was intact and his motor and sensory examination was normal.  (Tr. 1397, 1400.)  His gait was normal without spasticity, ataxia, or bradykinesis.  (Tr. 1400.)  Dr. Syed offered several differential diagnoses, including epileptic seizures, organic non-epileptic events, psychogenic nonepileptic seizures, or conversion disorder. (Tr. 1401.)  Dr. Syed ordered an EEG and noted "his dizziness appears psychogenic as well,

8

based on the dramatic manner with which he presented." (*Id*.)

On November 25, 2014, Rueda initially visited Priti Nair, M.D., a physical medicine and rehabilitation specialist. (Tr. 1420.) Rueda presented to Dr. Nair's office with a walker, reporting generalized pain, numbness in his arms and legs, and intermittent swelling in his joints. (*Id*.) On examination, Rueda's memory was impaired, his attention span and concentration were decreased, but his motor examination was normal. (Tr. 2120.) He had "give away" weakness throughout and altered sensation in his upper and lower extremities. (*Id*.) His coordination was normal and his gait was stable. (*Id*.) Dr. Nair advanced diagnoses of either fibromyalgia or conversion disorder. (*Id*.) She advised him to continue taking an antidepressant and ordered labwork. (*Id*.)

Rueda returned to Dr. Nair on December 15, 2014, with continued fatigue, swelling, and generalized pain. (Tr. 1933.) On examination, Rueda had diffuse pain and tender points in multiple regions of his body. (Tr. 1935.) His motor examination was normal and he had full strength in his upper and lower extremities. (*Id*.) Dr. Nair prescribed Gabapentin and Lyrica and again provided the differential diagnosis of fibromyalgia versus conversion disorder. (Tr. 1936.)

That same date, Dr. Nair filled out a form regarding Rueda's limitations. She offered the following limitations for Rueda:

- He can walk or stand for 2 hours at one time;

- He can stand/walk for 4 hours total in an eight-hour workday;

- He can sit for more than 3 hours at one time;

- He can sit for more than 6 hours total in an eight-hour workday;

- He does not need a job that permits shifting positions at will;

9

- He must use a cane or other assistive device when engaging in walking/standing;

- He will require unscheduled 15-minute breaks every hour;

- He does not require his legs to be elevated with prolonged sitting;

- He can frequently lift 10 pounds, occasionally lift 20 pounds, and never lift 50 pounds;

- He can occasionally kneel, stoop, crouch, squat, bend, climb stairs, and balance;

- He can frequently look down, turn his head right or left, and look up;

- He does not have any significant limitations with reaching, handling, or fingering;

- His impairments are not likely to produce "good days" or "bad days;"

- He would be absent from work more than four days a month.

(Tr. 2108-2112.)

Rueda returned to Dr. Syed on January 15, 2015, reporting he was still having his "usual spells." (Tr. 1758.)  He again had normal motor and sensory examinations. (Tr. 1759.)  Dr. Syed concluded "I believe [his] diagnosis is conversion disorder," noting the "psychopathological mechanism" of this disorder. (*Id*.)  Dr. Syed recommended meditation-based treatment, vestibular rehabilitation, and referred Rueda to his "higher health clinic." (*Id*.)  That same day, Rueda also saw Dr. Nair, who noted generalized diffuse pain and tender points in multiple regions of his body. (Tr. 1931.)  Dr. Nair again offered the differential diagnosis of fibromyalgia versus conversion disorder. (Tr. 1932.)

On February 20, 2015, Rueda visited the emergency room for chest pain. (Tr. 1819.)  A

10

chest x-ray indicated mild cardiomegaly, so Rueda was admitted overnight for observation.  (Tr. 1823.)

Rueda visited Dr. Syed at his "higher health clinic" on February 26, 2015.  (Tr. 1754.)  Dr. Syed noted Rueda continued to have "somatization/stress related symptoms."  (*Id*.)  Dr. Syed recommended Rueda begin exercising 30 minutes a day, five days a week, with a target heart rate of 120-130.  (Tr. 1755, 1757.)  Dr. Syed explained to Rueda "it is extremely important that during the exercise you regularly tell yourself (mentally or verbally) that you are exercising for the purpose of curing your symptoms."  (Tr. 1755.)

On March 23, 2015, Rueda reported good results with the Lyrica to Dr. Nair.  (Tr. 1925.)  On examination, he had diffuse pain and tender points in multiple regions.  (Tr. 1927.)  His motor exam, sensory exam, and coordination were all normal.  (Tr. 1927, 1928.)  His memory, concentration, and attention were all normal.  (Tr. 1927.)  He had full strength in his upper and lower extremities.  (*Id*.)  Dr. Nair listed Rueda's diagnoses as conversion disorder/fibromyalgia and ordered labwork to screen for lupus.  (Tr. 1928.)

On May 22, 2015, Rueda followed up with Dr. Syed, indicating extreme pain in his right shoulder.  (Tr. 1750.)  Rueda also reported he was baptized six months prior and had given up using drugs and alcohol at that time.  (*Id*.)  He relayed he felt healthier, but was still struggling with dizziness.  (*Id*.)  On examination, Rueda appeared to be in extreme pain and could not move his right arm.  (Tr. 1751.)  Dr. Syed told Rueda to return to the "higher health clinic" once his right arm healed.  (*Id*.)  Dr. Syed also noted the following

> [I]t is interesting that he came clean today and stated he was doing drugs and drinking a significant amount of alcohol when I first saw him in clinic.  His conversion to Seventh-Day Adventist coincided with him giving up these habits.  This added history of drug abuse compounds the process of

11

somatization, but treatment through higher health clinic should continue with
same plan.

(*Id*.)

On June 3, 2015, Rueda reported continued difficulty with his right shoulder to Dr. Nair.

(Tr. 1917.)  He had limited external and internal rotation in his shoulder on examination. (*Id*.)

Dr. Nair ordered an MRI of Rueda's right shoulder.  (Tr. 1920.)

On June 8, 2015, physicians' assistant Donna Exmer, PA-C, filled out a form regarding

Rueda's limitations, after completing a short physical examination on him.  (Tr. 1740-1745.)  Dr.

Syed also signed this form.  (Tr. 1745.)  They offered the following limitations for Rueda:

- He can stand/walk or sit for 15 minutes or less before needing to
  stop, rest, or change position;

- He can stand/walk or sit for one hour or less total during an eight-
  hour workday;

- He requires a job that permits shifting positions at will from sitting,
  standing, or walking;

- He requires an assistive device when standing or walking;

- He needs to take unscheduled breaks every 15 minutes for 15
  minutes at a time;

- His legs do not need to be elevated during periods of prolonged
  sitting;

- He can occasionally lift 10 pounds and never/rarely lift 20-50
  pounds;

- He can never/rarely kneel, stoop, crouch, squat, or balance;

- He can occasionally bend and climb stairs;

- He can occasionally look down, turn his head right or left, and look
  up;

12

- He does not have significant limitations with reaching, handling, or fingering;

- He can occasionally lift overhead, handle, and finger with the left upper extremity;

- He can never reach overhead with the right upper extremity and occasionally handle and finger with the right upper extremity;

- His impairments are likely to cause "good days" and "bad days;"and

- He would be absent from work more than four days a month.

(Tr. 1741-1745.)

On July 6, 2015, Rueda saw Dr. Syed and reported  his right shoulder had improved.  (Tr. 1746.)  Dr. Syed trained Rueda in heart beat meditation and recommended he meditate 10 minutes each night and continue physical exercise.  (Tr. 1747.)

On July 20, 2015, Rueda saw Dr. Nair, indicating he had two rounds of physical therapy for his shoulder and three shoulder injections, none of which he found helpful.  (Tr. 1913.)  Dr. Nair reviewed Rueda's right shoulder MRI, which revealed a glenoid labral tear.  (Tr. 1916.)  Dr. Nair referred Rueda to an orthopedist.  (*Id.*)  Rueda returned to Dr. Nair on August 3, 2015, reporting he was taking Percocet once a day for his pain.  (Tr. 1909.)  He indicated pain in his cervical spine and right hip as well.  (*Id.*)  Dr.  Nair ordered a right hip x-ray and prescribed Lyrica.  (Tr. 1912.)

Rueda visited Dr. Nair on August 20, 2015, indicating continued right hip pain.  (Tr. 1905.)  He was using a cane to ambulate due to this right hip pain.  (*Id.*)  Dr. Nair prescribed Lyrica and advised Rueda he would need a hip CT scan after his shoulder surgery.  (Tr. 1908.)

On August 24, 2015, Rueda underwent right shoulder surgery to repair a biceps tendon tear, impingement, and biceps tendinitis.  (Tr. 2009.)  Following this operation, he underwent

13

several injections in his right hip, which he did not find helpful.  (Tr. 1900.)  On September 28,

2015, Dr. Nair ordered a right hip MRI and prescribed Lyrica and Oxycodone.  (Tr. 1903.)

Rueda was hospitalized from September 30 to October 3, 2015 after reporting neck pain

and difficulty breathing.  (Tr. 1790, 1787.)  A CT scan of his neck revealed occlusion of his

airway by a possible soft tissue mass or infection.  (Tr. 1792.)  He underwent a laryngoscopy.

(Tr. 1787.)

On October 8, 2015, Rueda presented to the emergency room for recurrent chest pain.

(Tr. 1710.)  His EKG revealed no acute changes and his chest pain was determined to be non-

cardiac in nature.  (Tr. 1713, 1717.)  The emergency room physicians concluded his chest pain

was most consistent with pleurisy and prescribed him anti-inflammatory medications.  (Tr.

1718.)  A few days later, on October 13, 2013, Rueda returned to the emergency room, reporting

difficulty swallowing.  (Tr. 1828.)

Rueda was subsequently hospitalized for respiratory distress on October 23, 2015.  (Tr.

1779.)  He required intubation and underwent a tracheostomy, partial thyroidectomy, and a

biopsy of the mass in his throat.  (Tr. 1776, 1782, 1784.)  He was discharged to a skilled nursing

facility several days later.  (Tr. 2138.)

Rueda required hospitalization again on November 5, 2015, after bloody sputum was

found at his tracheostomy site.  (*Id*.)  A CT scan of his chest revealed a pulmonary embolism.

(*Id*.)  He began anticoagulant therapy and was sent back to the skilled nursing facility on

November 9, 2015.  (Tr. 2087, 1517.)  However, he returned to the emergency room on

November 25, 2015, due to trouble swallowing and throat pain.  (Tr. 2147.)  The emergency

room doctors referred him to an ENT specialist and Rueda returned to the skilled nursing facility

that same day.  (Tr. 2152.)

Rueda continued to reside in a nursing home during the first half of December 2015.  (Tr. 2155.)  On December 12, 2015, Rueda visited the emergency room for shortness of breath and leg swelling.  (*Id.*)  The emergency room doctors noted Rueda had not yet had his throat mass removed.  (*Id.*)  A chest CT scan indicated no acute changes and he was discharged the same day. (Tr. 2160, 2161.)  Rueda remained in the nursing home until December 22, 2015.  (Tr. 1427.)

On December 31, 2015, Rueda underwent a home health care assessment with registered nurse Sandra Blackburn, RN.  (Tr. 1433.)  During the assessment, Ms. Blackburn noted Rueda was ambulatory with an assistive device, had fair strength, and required occasional assistance or rest periods.  (*Id.*)  He swayed but was able to catch himself and could fully bear his weight.  (*Id.*) Ms. Blackburn observed that Rueda required a two-handed device to walk alone on a level surface, but was able to feed himself, bathe, and dress.  (Tr. 1443.)  She noted Rueda required daily help with his activities of daily living.  (Tr. 1448.)

In January 2016, Rueda visited the emergency room four times.  (Tr. 2169, 2087, 2180, 2206.)  Two of the visits were for shortness of breath.  (Tr. 2169, 2087.)  Rueda continued to take an anticoagulant for his pulmonary embolism.  (*Id.*)  The third visit was for chest pain and the fourth visit was for shoulder pain after a fall.  (Tr. 2180, 2206.)

Rueda also continued to receive home healthcare nurse visits in January 2016.  (Tr. 1465, 1471.)  He did not report any falls and he was provided with information on avoiding infection at his tracheostomy site.  (*Id.*)

On January 21, 2016, Rueda returned to Dr. Nair for treatment.  (Tr. 1895.)  He informed her of his recent health problems, including the mass in his neck and tracheostomy.  (*Id.*)  He

15

indicated he had received speech therapy following these issues.  (*Id*.)  He reported increased pain in his knees, but no recent falls.  (*Id*.)  Dr. Nair noted Rueda had a stable gait and normal coordination.  (Tr. 1899.)  On examination, Rueda had numbness throughout his right arm.  (*Id.*)  Dr. Nair prescribed Lyrica and Oxycodone.  (*Id.*)

On March 4, 2016, Rueda visited the emergency room for head pain, shakiness, and nausea.  (Tr. 2212.)  A cervical spine x-ray revealed degenerative changes.  (Tr. 2219.)  A CT scan of Rueda's head was negative.  (Tr. 2221.)  The emergency room physicians concluded it was likely neuropathic scalp pain.  (Tr. 2222.)

Rueda was admitted overnight for chest pain and dizziness on March 17, 2016.  (Tr. 2072.)  He had sustained a fall at home and hurt his knees.  (*Id*.)  He also required hospitalization for chest pain on April 17, 2016.  (Tr. 2228, 2234.)  A chest x-ray and brain CT scan were negative.  (Tr. 2232, 2233.)

On April 29, 2016, Rueda was again admitted for chest pain.  (Tr. 2255.)  He consulted with cardiologist Ariane Neyou, M.D., who ruled out acute coronary syndrome.  (*Id*.)  Finally, on May 6, 2016, Rueda visited the emergency room for right flank pain and shortness of breath. (Tr. 2121.)  His chest x-ray was negative and he was discharged the same day.  (Tr. 2124, 2125.)

On May 27, 2016, Dr. Nair submitted a form regarding Rueda's limitations.  (Tr. 2248-2253.)  She offered the following limitations/observations for Rueda:

- Emotional factors contribute to the severity of his symptoms and functional limitations;

- Depression and anxiety affect his physical condition;

- He frequently experiences pain or other symptoms severe enough to interfere with attention and concentration;

16

- He is incapable of even "low stress" jobs due to a possible conversion disorder;

- He is unable to walk one city block;

- He can sit and stand for 15 minutes at one time;

- He can sit and stand/walk for about 4 hours total in an 8-hour workday;

- He requires 3-minute periods of walking around every 15 minutes during an 8-hour workday;

- He requires a job that permits shifting positions at will from sitting, standing, or walking;

- He requires unscheduled breaks during an 8-hour workday;

- He is "unable to work" and needs to rest for 6 hours in an 8-hour workday;

- He does not need to elevate his legs with prolonged sitting;

- He must use a cane or other assistive device when engaging in occasional standing/walking;

- He can occasionally lift less than 10 pounds;

- He can never lift 10-50 pounds;

- He has significant limitations in repetitive reaching, handling, and fingering;

- His impairments are not likely to produce "good days" and "bad days;" and

- His depression and chronic pain impact his ability to work at a regular job on a sustained basis.

(*Id.*)

**C.      State Agency Reports**

**1.      Mental Impairments**

17

On August 27, 2014, state agency physician Karla Voyten, Ph.D., reviewed Rueda's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr.277.)  She concluded Rueda had (1) mild restrictions in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation.  (*Id.*)  Dr. Voyten concluded "the evidence in file does not support a severe impair[ment] that results in any significant psychological limitations."  (*Id.*)

On December 27, 2014, state agency physician Ermias Seleshi, M.D., reviewed Rueda's medical records and completed a PRT.  (Tr. 250-251.)  Dr. Seleshi affirmed Dr. Voyten's conclusion.  (*Id.*)

### 2.        Physical Impairments

On August 20, 2014, 2014, state agency physician Leigh Thomas, M.D., reviewed Rueda's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 289-290.)  Dr. Thomas determined Rueda could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 289.)  She further found Rueda could frequently climb ramps and stairs, occasionally climb ladders, ropes, or scaffolds, and frequently stoop, kneel, crouch, and crawl.  (Tr. 290.)

On January 7, 2015, state agency physician Gerald Klyop, M.D., reviewed Rueda's medical records and completed a Physical RFC Assessment.  (Tr. 252-254.)  Dr. Klyop determined Rueda could lift and carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk for about 2 hours in an 8-hour workday; and sit for about 6 hours in

an 8-hour workday.  (Tr. 252-253.)  He further found Rueda could occasionally climb ramps and

stairs, never climb ladders, ropes, or scaffolds, occasionally balance, and frequently stoop, kneel,

crouch, and crawl.  (Tr. 253.)  He concluded Rueda must avoid all unprotected heights and

dangerous machinery.  (Tr. 254.)

**D.      Hearing Testimony**

During the June 8, 2016 hearing, Rueda testified to the following:

- He graduated high school.  (Tr. 223.)  He has worked as a janitor and a die
  setter.  (Tr. 224, 225.)  He also worked for a plastics company, running a plastic
  injection machine and inspecting the product.  (Tr. 227, 228.)  He worked as a
  job coach for individuals with mental disabilities.  (Tr. 228, 229.)

- He cannot work because of fibromyalgia, falling, dizziness, diarrhea, and colitis.
  (Tr. 230.)  In 2014, he lost consciousness and fell down 13 steps.  (Tr. 233.)  He
  required a nursing home stay after this incident.  (*Id.*)

- He also has problems with his neck, lower back, and hips.  (Tr. 231, 232.)

The VE testified Rueda had past relevant work as a janitor (D.O.T. #381.687-018), plastic

injection machine operator (D.O.T. #556.685-038), inspector, hand packager (D.O.T. #559.687-

074), die setter (D.O.T. 556.380-010), and job coach (D.O.T. #094.224-022).  (Tr. 233-234.)

The ALJ posed the following hypothetical question:

[A]ssume an individual who has light[3] exertion, who can occasionally push,

---

[3]     "Light work" is defined as follows: "Light work involves lifting no more than 20
pounds at a time with frequent lifting or carrying of objects weighing up to 10
pounds. Even though the weight lifted may be very little, a job is in this category
when it requires a good deal of walking or standing, or when it involves sitting
most of the time with some pushing and pulling of arm or leg controls. To be
considered capable of performing a full or wide range of light work, you must
have the ability to do substantially all of these activities." 20 CFR § 404.1567(b).
Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying
requires being on one's feet up to two-thirds of a workday, the full range of light
work requires standing or walking, off or on, for a total of approximately six

pull bilaterally, who can occasionally climb ladders, ropes, and scaffolds,
who frequently climb ramps and stairs, who can frequently stoop, kneel,
crouch, and crawl. Who is unlimited in balancing, who can occasionally do
overhead reaching bilaterally. And no mental limitations.

(Tr. 236.)

The VE testified the hypothetical individual could perform Rueda's past relevant work of

job coach; inspector, hand packager; and plastic injection machine operator. (*Id*.) The ALJ then

added the additional limitation of avoiding "working around unprotected heights." (*Id*.) The VE

testified this additional limitation would not change her answer to the hypothetical. (*Id*.)

The ALJ then posed another hypothetical question:

Okay. Now let's go to another hypothetical. Medium[4] exertion, occasionally
climb ladders, ropes, and scaffolds, frequently climb ramps and stairs,
frequently stoop, kneel, crouch, and crawl. Unlimited balancing and I'm
going to say avoid working around unprotected heights.

(Tr. 236-237.)

The VE testified this hypothetical individual could perform all of Rueda's past relevant

work. (Tr. 237.)

## III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

---

hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

[4]      "Medium work" is defined as follows: "medium work involves lifting no more
than 50 pounds at a time with frequent lifting or carrying of objects weighing up
to 25 pounds. If someone can do medium work, we determine he or she can also
do sedentary and light work." 20 CFR § 404.1567(c). Social Security Ruling
83–10 clarifies that "a full range of medium work requires standing and walking,
off and on, for a total of approximately 6 hours in an 8-hour workday in order to
meet the requirements of frequent lifting and carrying objects weighing up to 25
pounds." SSR 83–10, 1983 WL 31251 (1983).

time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when she became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under

21

20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Rueda was insured on his alleged disability onset date, October 15, 2013, and remained insured through December 31, 2018, his date last insured ("DLI.")  (Tr. 13.)  Therefore, in order to be entitled to POD and DIB, Rueda must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since October 15, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. From October 15, 2013 to June 2015, the claimant had the following severe impairments: cervical degenerative disc disease and medial patellofemoral degenerative changes.  As of June 2015, the claimant has had the following severe impairments: cervical degenerative disc disease, medial patellofemoral degenerative changes, bicipital tenosynovitis, and glenoid labrum tear in right shoulder status post-surgical repair (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments

22

that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that from October 15, 2013 to September 1, 2015, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he could occasionally climb ladders, ropes, and scaffolds, could frequently climb ramps and stairs, could frequently stoop, kneel, crouch, and crawl, had unlimited balance ability, and must have avoided work around unprotected heights.  From September 2, 2015 through the present, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he could occasionally push and pull bilaterally, could occasionally climb ladders, ropes, and scaffolds, could frequently climb ramps and stairs, could frequently stoop, kneel, crouch, and crawl, has unlimited balance ability, could occasionally reach overhead bilaterally, must have avoided work around unprotected heights, and has no mental limitations.

6.    From October 15, 2013 to September 1, 2015, the claimant was capable of performing past relevant work as a janitor, die setter, machine operator, inspector hand packager, and job coach.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity during this period (20 CFR 404.1565 and 416.965).  From September 1, 2015 through the present, the claimant has been capable of performing past relevant work as a machine operator, inspector hand packager, and job coach.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity during this period (20 CFR 404.1565 and 416.965).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2013, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 13-24.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to

proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the

24

regulations is grounds for reversal.  *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.     Medical Opinions

In his second assignment of error, Rueda argues the ALJ improperly evaluated the opinions of his treating physicians, Drs. Nair and Syed.  (Doc. No. 13 at 15-17.)  He asserts the ALJ did not provide "good reasons" for rejecting the opinions of Dr. Nair because (1) normal objective findings were expected for fibromyalgia, conversion disorder, and vertigo; (2) the ALJ did not re-contact Dr. Nair to request additional evidence regarding Rueda's fibromyalgia; and (3) the ALJ "failed to explain how [Rueda's] making sandwiches, cooking frozen food or taking

medical transportation since his 2014 fall, detracted from the doctor's opinion." (*Id.* at 15-16.)
As for Dr. Syed's opinion, Rueda argues the ALJ failed to provide "good reasons," noting "the
fact that Dr. Syed did not fill out the questionnaire was not sufficient reason to not give his
opinion controlling weight." (*Id.* at 17.)  Rueda further contends the ALJ "failed to consider the
context of the exercises [prescribed by Dr. Syed] and [Dr. Syed's] reasons for prescribing them."
(*Id.*)

   The Commissioner maintains the ALJ properly evaluated the medical opinion evidence.
(Doc. No. 14 at 15.)  With respect to Dr. Nair's first opinion, the Commissioner argues "after
only two office visits, Dr. Nair did not qualify as a 'treating source' described in the regulations."
(*Id.* at 16.)  She also argues Dr. Nair's opinion had a "lack of clinical support" and no
explanation as to how "the medical findings supported the limitations assessed." (*Id.* at 17.)  In
regards to Dr. Nair's second opinion, the Commissioner notes the opinion was a "check-the-box
opinion," and as such, "an ALJ is not required to give controlling weight to a treating physician's
opinion that is not 'well-supported by medically acceptable clinical and laboratory techniques.'"
(*Id.* at 18.)  Finally, the Commissioner argues Dr. Syed's opinion "contained no diagnoses and no
clinical findings or test results showing Plaintiff's medical impairments" and thus, the ALJ
"properly gave little weight to this opinion." (*Id.* at 21.)

   As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain
standards on the treatment of medical source evidence.'" *Gayheart v. Comm'r of Soc. Sec.*, 710
F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical
opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source
of the opinion . . . dictates the process by which the Commissioner accords it weight." *Id.*  "As a

general matter, an opinion from a medical source who has examined a claimant is given more

weight than that from a source who has not performed an examination (a 'nonexamining

source'), *id*. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly

treats the claimant (a 'treating source') is afforded more weight than that from a source who has

examined the claimant but does not have an ongoing treatment relationship (a 'nontreating

source'), *id*. § 404.1502, 404.1527(c)(2)."  *Id.*  In other words, "'the regulations provide

progressively more rigorous tests for weighing opinions as the ties between the source of the

opinion and the individual become weaker.'"  *Gayheart,* 710 F.3d at 375 (quoting Soc. Sec. Rul.

No. 96–6p,[5] 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).

A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is

not inconsistent with the other substantial evidence in [the] case record."  *Gayheart*, 710 F.3d at

376; 20 C.F.R. § 404.1527(c)(2).[6]  However, "a finding that a treating source medical opinion . . .

is inconsistent with the other substantial evidence in the case record means only that the opinion

is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r*

*of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Indeed, "[t]reating source medical opinions are still

entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §

---

[5] SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017.
*See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27,
2017).

[6] Revised versions of these regulations took effect on March 27, 2017 and apply to
disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[7]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this

---

[7]Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406. Moreover, the "treating physician rule" only applies to *medical opinions*. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. App'x 498, 505 (6th Cir. 2013). The opinion, however, "is not entitled to any particular weight." *Turner*, 381 Fed. App'x at 493. *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir. 2014).

However, in order to be considered a treating source, the physician must have "an ongoing treatment relationship with" the claimant, and the frequency of treatment must be "consistent with accepted medical practice" for the claimant's condition. 20 C.F.R. §§ 404.1502 and 416.902. *See Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x 267, 273 (6th Cir. July 13, 2015). Precedent in this Circuit suggests a physician who treats an individual only twice or three times does not constitute a treating source. *See Kornecky v. Comm'r of Soc. Sec*., 167 Fed. App'x 496, 506–07 (6th Cir. 2006); *Kepke v. Comm'r of Soc. Sec*., 636 Fed. App'x 625, 629 (6th Cir. 2016) ("It was not improper for the ALJ to discount Dr. Chapman's opinion on the basis that he treated Kepke only three times over a three month period); *Mireles ex rel. S.M.M. v.*

29

*Comm'r of Soc. Sec.*, 608 Fed. App'x 397, 398 (6th Cir. 2015);  *Helm v. Comm'r of Soc. Sec.*

*Admin.*, 405 Fed. App'x 997, 1000–01 n. 3 (6th Cir. 2011.)  *See also Fleischer,* 774 F.Supp.2d at

879; *Pethers v. Comm'r of Soc. Sec.*, 580 F.Supp.2d 572, 579 n .16 (W.D. Mich.2008); *Carter v.*

*Berryhill*, 2017 WL 2544064 at * 9 (N.D. Ohio May 26, 2017), *report and recommendation*

*adopted by* 2017 WL 2537066 (N.D. Ohio June 12, 2017); *Witnik v. Colvin,* 2015 WL 691329 at

* 7 (N.D. Ohio Feb. 18, 2015); *Hickman v. Colvin*, 2014 WL 2765670 at * 12 (M.D. Tenn. June

18, 2014), *report and recommendation adopted by* 2014 WL 3404967 (M.D. Tenn. July 10,

2014).

### Dr. Nair -December 2014 opinion

The ALJ weighed the December 2014 opinion evidence from Dr. Nair as follows:

The undersigned has also considered the December 2014 opinion of Dr.
Nair, one of the claimant's treating providers (34F).  Dr. Nair stated that the
claimant's pain would constantly interfere with his ability to pay attention
and concentrate, that the claimant could only stand or walk for 2 [hours] at
a time and for 4 hours total, that the claimant needs an assistive device and
needs to take a 15 minutes[sic] break every hour, that the claimant can lift
20 pounds occasionally and 10 pounds frequently, can occasionally perform
postural, that he can frequently make neck movements, and that he would
likely miss more than 4 days of work per month (34F/5).

The undersigned first notes this opinion was only given after two treatment
visits, decreasing its probative value.  Further, the opinion is internally
inconsistent in various areas.  For example, Dr. Nair stated that the
claimant's pain would constantly interfere with his ability to pay attention
and concentrate, but also stated that the claimant's impairments are not
reasonable consistent with the symptoms and limitations described in the
evaluation.  Further, at a treatment visit with Dr. Nair around the time the
opinion was formed, although the claimant displayed pain upon
examination, he otherwise was noted to be in no acute distress, and he
exhibited normal strength, normal motor exam, normal sensation, normal
strength, normal reflexes, a normal gait, normal attention, normal memory,
and normal concentration.  Hence, these findings do not generally support
the extent to which Dr. Nair opined that the claimant was limited.  In
addition, he was vague, imprecise and incomplete in documenting his

30

> findings regarding fibromyalgia. He stated the claimant had "generalized diffuse pain and tender points noted and multiple regions." However, he did not identify what regions of the body, the number of tenderpoints or their locations. For these reasons, this opinions is given little weight.

(Tr. 21-22.)

Before the Court reaches the question as to whether the ALJ complied with the "treating physician rule," it must first determine whether Dr. Nair constituted a treating source at the time of her November 2014 opinion. *See Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec*., 482 F.3d 873, 876 (6th Cir. 2007)).

For the following reasons, the Court finds Dr. Nair did not constitute a treating source, and therefore her opinion is not subject to the "treating physician rule." Dr. Nair personally examined Rueda on only two occasions prior to her November 2014 opinion. (Tr. 2108.) These two encounters do not establish the ongoing treatment relationship necessary to be considered a treating source. *See Smith*, 482 F.3d at 876. *See also Kornecky*, 167 Fed. App'x at 506–07 ("Depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship");

While Dr. Nair did go on to see Rueda on a regular basis over the following two years, the inquiry into a physician's treating source status considers only the physician's relationship with the claimant *at the time the opinion was rendered. Kornecky* , 167 Fed. App'x at 506 (6th Cir. Feb. 9, 2006). The fact Dr. Nair may have continued to treat and see Rueda *after* offering her November 2014 opinion is not relevant to establishing whether Dr. Nair constitutes a treating source for purposes of weighing the opinion.

Because Dr. Nair was not Rueda's treating physician at the time of the November 2014 opinion, the ALJ was not required to determine whether her opinion was entitled to "controlling

weight," or articulate "good reasons" for discounting it.  The ALJ expressly acknowledged Dr. Nair's November 2014 opinion and provided several reasons for the weight ascribed to this opinion.  (Tr. 22.)  Specifically, the ALJ noted the brief treating relationship between Dr. Nair and Rueda, the objective findings made at the time of the November 2014 opinion, and the vague findings made by Dr. Nair in regards to Rueda's fibromyalgia.  (*Id*.)

Indeed, a review of the Dr. Nair's December 2014 treatment note indicates Rueda had full strength in his arms and legs, a normal motor exam, a normal sensory exam, a stable gait, and normal coordination.  (Tr. 1935-1936.)  Dr. Nair advanced a possible diagnosis of fibromyalgia, but only noted the objective findings of "generalized diffuse pain and tender points noted and multiple regions," without specifically indicating how many tender points and in which regions of the body.  (Tr. 1935.)  Dr. Nair made similar findings in January 2015.  (Tr. 1931-1932.)  The ALJ discussed these objective findings, as well as acknowledging the short treating relationship prior to the rendering of the decision, which are both applicable factors set forth under the regulations.  *See Cruse*, 502 F.3d at 541.  Procedurally, the regulations require no more for a non-treating, examining physician.  Thus, the Court finds the ALJ sufficiently articulated her reasons for according "little weight" to Dr. Nair's November 2014 opinion, and further, that those reasons are supported by substantial evidence.

### Dr. Nair – May 2016 opinion

The ALJ weighed the opinion evidence from Dr. Nair's May 2016 opinion as follows:

> Likewise, little weight is given to the May 2016 opinion of Dr. Nair that the claimants pain will frequently interfere with his attention and concentration, that the claimant can only sit, stand, or walk for 4 hours in a workday and is unable to even walk one city block, that the claimant needs to take unscheduled breaks throughout the day, that the claimant can only occasionally lift less than 10 pounds, that the claimant needs an assistive

device, and that the claimant has significant limitations in reading,
handling, and fingers (36F).

The undersigned first notes that this form is largely a check box marked
form with little narrative, explanation, or reference to findings to explain
answers.  Further, the language used on the form is vague.  For example,
one question asks how long the claimant is able to sit, stand, or walk
without asking about each activity individually.  Moreover, the extreme
nature of the opinion is generally inconsistent with the overall record, such
as the claimant's often noted lack of acute distress, normal gait, normal
strength, normal range of motion, normal attention and concentration, and
the extent of his activities of daily living, such as driving, shopping,
cooking, and cleaning.  The undersigned also notes that Dr. Nair states that
the claimant's impairments are not likely to produce good and bad days,
inferring that the claimant's conditions cause these limitations every day,
which is unreasonable in light of the objective evidence of record, noted
above.

(Tr. 22.)

The Court finds the ALJ failed to properly evaluate Dr. Nair's May 2016 opinion.[8]  As

noted above, an ALJ must provide "good reasons" for the weight assigned to treating source

opinion, and articulate those reasons in order to allow for meaningful appellate review.  Here, the

ALJ did neither.  While the ALJ did provide several reasons for discounting Dr. Nair's opinion,

they are not supported by substantial evidence.

In particular, the ALJ references the fact the opinion is "largely a check box marked

form with little narrative, explanation, or reference to findings to explain answers."  (Tr. 22.)  As

the Commissioner notes, the Sixth Circuit has discounted "check-box analysis" as "weak

---

[8]      The Court notes it is undisputed Dr. Nair constituted a treating physician at the
time of her May 2016 opinion.  (*See* Doc. No. 13 at 16, Doc. No. 14 at 18.)
Indeed, a review of the medical record reveals Dr. Nair saw Rueda at least 10
times between November 2014 and May 2016.  (Tr. 1420, 1933, 1931, 1925,
1917, 1913, 1909, 1905, 1900, 1895.)

33

evidence at best," particularly when it is not accompanied by any supportive findings or records. *See Shepard v. Comm'r of Soc. Sec.,* 705 Fed App'x 435, 441 (6th Cir. Sept. 26, 2017); *see also Hernandez v. Comm'r of Soc. Sec.,* 644 Fed. App'x 468, 474-475 (6th Cir. Mar. 17, 2016); *Ellars v. Comm'r of Soc. Sec.,* 647 Fed App'x 563, 566 (6th Cir. May 6, 2016)("Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's 'check-off form' of functional limitations that 'did not cite clinical test results, observations, or other objective findings . . . '").  However, the Sixth Circuit has also found "checklist opinions are not *per se* unreliable,"particularly when accompanied by an explanation for the findings.  *See Kepke v. Comm'r of Soc. Sec.,* 636 Fed App'x 625, 630 (6th Cir. Jan. 12, 2016).

Regardless, the Court does not agree with the ALJ's or the Commissioner's characterization of Dr. Nair's May 2016 opinion as a "check box marked form with little narrative, explanation, or reference to findings to explain answers."  (Tr. 22, *see also* Doc. No. 14 at 18.)  Indeed, a review of Dr. Nair's opinion reveals she not only listed Rueda's diagnoses and symptoms, but also identified specific clinical findings and objective signs to support her opinion, including two MRIs, and a rotator cuff tear operation.  (Tr. 2248.)  She also explained the reasoning behind her conclusion Rueda was incapable of "low stress" jobs, citing his conversion disorder.  (Tr. 2250.)  She provided specific standing and sitting limitations for Rueda, as well as detailed lifting limitations.  (Tr. 2250, 2252.)  Finally, Dr. Nair acknowledged Rueda's depression and chronic pain were likely playing a role in his inability to work on a sustained basis.  (Tr. 2253.)  This opinion is not a questionnaire in which a physician "failed to provide any explanation for [her] responses."  *Kepke,* 636 Fed App'x at 630 (citing *Price v.*

34

*Comm'r of Soc. Sec.,* 342 Fed. App'x 172, 176 (6th Cir. 2009).).  Rather, Dr. Nair provided

detailed limitations for Rueda and provided justification for these limitations, noting the

symptoms, the diagnostic testing, and the role Rueda's conversion disorder and depression

played into his limitations.

Further, the ALJ discounted Dr. Nair's opinion on the basis "the extreme nature of the

opinion is generally inconsistent with the overall record." (Tr. 22.)  The ALJ then references

treatment notes indicating Rueda had a "lack of acute distress, normal gait, normal strength,

normal range of motion, normal attention and concentration." (*Id.*)  As an initial matter, the ALJ

fails to cite or direct the reader to the specific treatment notes she references to support her

reasoning.  Moreover, within many of the treatment notes, Rueda had abnormal sensation,

weakness, decreased concentration and attention, diffuse pain and tender points, decreased range

of motion in the lumbar and cervical spines, limited external and internal rotation in the right

shoulder, required an assistive device to ambulate, and documented falls.  (Tr. 2120, 1935, 1931,

545, 973, 1399, 1917, 1443, 2206.)

In addition, the ALJ does not acknowledge or address several key pieces of evidence in

the decision.  A review of the decision reveals at Step Four the ALJ spent 1.5 pages to review

over 2,000 pages of medical evidence.  (Tr. 20-21.)  Within this scant discussion of the medical

evidence, the ALJ either failed to acknowledge or mischaracterized several portions of evidence.

For example:

- The ALJ acknowledged Rueda had been hospitalized for "breathing issues," but noted the "etiology causing these symptoms was unknown," despite the fact Rueda was found to have a pulmonary embolism, a soft tissue mass in his throat, and required intubation and a tracheostomy.  (Tr. 15, 1776, 2138.)  Rueda remained on anticoagulant therapy for the remainder of the relevant

period.  (Tr. 2256.)

- Following the discovery of the pulmonary embolism, Rueda was admitted to a skilled nursing facility in late 2015, where he remained for over a month.  (Tr. 1517, 1427, 2152.)  Following his discharge from this facility, Rueda required home health care.  (Tr. 1433.)  The ALJ, however, only mentioned one nursing home stay in 2014 and did not mention the need for home health care at all. (Tr. 15-16.)

- The ALJ mentions the fall from August 2014, noting Rueda "fell and suffered an acute injury."  (Tr. 15-16.)  However, the ALJ fails to mention Rueda had actually lost consciousness and fell down a flight of stairs.  (Tr. 1670, 876.)  The ALJ also does not discuss the fact Rueda's vertigo and falls continued to occur on a regular basis, with a few events of transient loss of consciousness.  (Tr. 838, 876, 1066.)  In September 2014, Rueda was hospitalized again after a fall, and required several weeks of physical therapy at a skilled nursing facility and a walker.  (Tr. 1066, 1644.)

- The ALJ mischaracterized Dr. Syed's recommendations Rueda "should be exercising 30 minutes per day for 5 days every week," using the recommendation to suggest his physical abilities were greater than alleged.  (Tr. 20.)  However, the ALJ took this recommendation out of context.  Dr. Syed provided this recommendation as treatment for his conversion disorder and somatization symptoms, stressing to Rueda it was "extremely important that during the exercise you regularly tell yourself(mentally or verbally) that you are exercising for the purpose of curing your symptoms."  (Tr. 1755.)  Rather than acknowledging Rueda's treatment providers felt his conversion disorder required treatment, the ALJ suggested the diagnosis of conversion disorder discredited Rueda's allegations.  (Tr. 20.)

- The ALJ generally referenced Rueda had been "hospitalized following various complaints," but discredited these hospitalizations, noting "there are no documented lasting conditions to account for the claimant's symptoms at these visits." (Tr. 15.)  However, a review of the record reveals Rueda had been hospitalized at least 14 times during the relevant period.  (Tr. 1197, 740, 761, 677, 1188, 1173, 864, 1140, 1819, 1790, 1776, 1770, 2186, 2072, 2234, 2255.)  During some of these hospitalizations, Rueda required rather significant medical treatment and nursing home care following his admission.  (*See* Tr. 1779, 1784, 1787,

36

2138, 2152.)  Moreover, the ALJ does not discuss the fact Rueda
visited the emergency room at least twenty four times during the
relevant period.  (Tr. 712, 658, 635, 625, 526, 508, 495, 1332, 479,
860, 1309, 1269, 838, 842, 1127, 1710, 1828, 2147, 2155, 2169,
2087, 2206, 2212, 2121.)  While it is true much of the diagnostic
testing during these emergency room visits was normal, as one
would expect for a somatoform condition such as conversion
disorder, the ALJ completely failed to mention the high frequency
in which Rueda presented to the emergency room in her discussion.

While the ALJ is not expected to discuss or cite each and every piece of evidence
contained in the medical record, the amount of diagnostic testing, hospitalizations, and diagnoses
the ALJ did not discuss or analyze is alarming.  Pointedly, this undercuts her reasoning Dr.
Nair's opinion is not supported by the "overall record."

The ALJ does not sufficiently explain how, in light of the above evidence, "the medical
evidence of record" supports affording Dr. Nair's opinion "little" weight.  The Sixth Circuit has
made clear that an ALJ's conclusory and unexplained statement a treating physician opinion is
inconsistent with the medical evidence of record, does not constitute a "good reason" for
purposes of a rejecting an opinion.  *See, e.g., Friend v. Comm'r of Soc. Sec.,* 375 Fed. App'x 543,
552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as
'incompatible' with other evidence of record; there must be some effort to identify the specific
discrepancies and to explain why it is the treating physician's conclusion that gets the short end
of the stick."); *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 245–46 (6th Cir. 2007) (finding an
ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's
opinion where the ALJ merely stated, without explanation, that the evidence of record did not
support the severity of said limitations); *Bartolome v. Comm'r of Soc. Sec*., 2011 WL 5920928
(W.D. Mich. Nov.28, 2011) (noting that merely citing to "the evidence" and referring to the

37

appropriate regulation was insufficient to satisfy the "good reasons" requirement); *Patterson v. Astrue*, 2010 WL 2232309 (N.D.Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the objective medical evidence and appears to be based solely on [claimant's] subjective performance.").

Had the ALJ provided a more detailed discussion of the treatment notes prior to weighing Dr. Nair's opinion, this Court may have been able to conduct a meaningful appellate review.  However, the ALJ did not provide a comprehensive discussion of the evidence, and in fact, ignored several important pieces of medical evidence that do not support her conclusion. The ALJ cannot cure a deficient explanation by simply reciting some of the evidence, and then follow it with an unexplained conclusion the treating source opinion is inconsistent with the evidence.  *Boughter v. Colvin,* 2016 WL 7670046 at *19 (N.D. Ohio Dec. 12, 2016).  *See also Sacks v. Colvin*, 2016 WL 1085381 at * 5 (S.D. Ohio March 21, 2016) ("[A]lthough the ALJ made a general statement about inconsistencies between Dr. Bhatia's opinions and the 'medical evidence of record,' it was just that-a general statement devoid of any specific reference to any portion of the medical evidence. Such conclusory statements do not provide the claimant with any ability to understand their content, nor do they provide a reviewing court with the ability to decide if the ALJ correctly or incorrectly assessed those claimed inconsistencies.").

Finally, the ALJ reasons Dr. Nair's opinion is unsupported by "the extent of his activities of daily living, such as driving, shopping, cooking, and cleaning."  (Tr. 22.)  However, the ALJ fails to explain how this level of daily activity is inconsistent with Dr. Nair's lifting, manipulative, and sit/stand/walk limitations.  Moreover, the ALJ disregards the fact Rueda has

38

required home health care during the relevant period and required assistance with his activities of daily living.  (Tr. 1448.)  The Court notes the ALJ failed to elicit any testimony from Rueda regarding his daily activities at the hearing, but instead relied on an August 2014 consultative examination and an April 2014 physical therapy visit.  (Tr. 14, 491, 465.)

In sum, the ALJ's decision fails to set forth good reasons for discounting the opinion of Dr. Nair.  Moreover, this portion of the decision is so conclusory it deprives this Court the ability to conduct a meaningful review.  Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to sufficiently address the limitations assessed by Dr. Nair.

### Dr. Syed

The ALJ weighed the opinion evidence from Dr. Syed as follows:

> Finally, the undersigned has considered the paperwork filled out by Donna Exider, PA-C (22F).  While Dr. Syed, one of the claimant's treating providers, appear to co-sign this paperwork, as noted in the document, Ms. Exider, not Dr. Syed, performed a "short physical," and the writing appears to match Ms. Exider's handwriting, not Dr. Syed's signature.  Further, the form is a preprinted form with checkmarks with little to no narrative explanation or support from the treatment notes.  Moreover, the form contains extreme limitations, such as that the claimant can only sit, stand, or walk for an hour or less in a workday, which are generally inconsistent with the overall record, such as the claimant's often noted normal gait, normal strength, normal range of motion, and lack of acute distress.  Further, as discussed above, the undersigned notes that Dr. Syed himself advised the claimant that he should be exercising 30 minutes per day for 5 days per week, which is inconsistent with the extreme limitations noted on the form.  At such, this opinion is given little weight.

(Tr. 22.)

The Court also finds the ALJ failed to properly evaluate Dr. Syed's opinion.  As an initial matter, both the ALJ and the Commissioner appear to suggest because Dr. Syed co-signed

39

a form completed by a physician's assistant, it is not Dr. Syed's opinion.  (Doc. No. 14 at 21, Tr. 22.)  The Court is not persuaded by this argument. Courts within this circuit have treated opinions co-signed by a treating acceptable medical source as an opinions of that treating source. *See Brown v. Comm'r of Soc. Sec.*, 2015 WL 4275556 at *11 (N.D. Ohio July 14, 2015)("Although the issue has yet to be addressed by the Sixth Circuit, prior decisions have held that a doctor's co-signature indicates at a minimum that the doctor agrees with the other sources opinion . . .[i]t follows then, that if the signing physician or psychologist has personally examined the claimant, the opinion must be treated as the doctor's own."); *Pater v. Comm'r of Soc. Sec.*, 2016 WL 3477220 at *7 (N.D. Ohio June 27, 2016)("Under the law, there is no difference between 'opinions filled out and signed by a treating psychiatrist and opinions filled out by a social worker and then signed – thus adopted – by a treating psychiatrist."); *Robinson v. Comm'r of Soc. Sec.*, 2015 WL 5768483 at *3 (S.D. Ohio Sept. 30, 2015).  Here, Dr. Syed personally examined Rueda on multiple occasions prior to co-signing this June 2015 opinion. (Tr. 1397, 1758, 1754, 1750.)  Thus, the Court considers this an opinion from a treating acceptable medical source subject to the "good reasons" requirement.

The Court also finds the ALJ's statement Dr. Syed's opinion is "a preprinted form with checkmarks with little to no narrative explanation or support from the treatment notes" does not constitute a good reason for rejection.  (*See* Tr. 22.)  As noted *supra*, the Sixth Circuit has discounted "check-box analysis" as "weak evidence at best," particularly when it is not accompanied by any supportive findings or records.  *See Shepard,* 705 Fed App'x at 444. However, the Sixth Circuit has also found "checklist opinions are not *per se* unreliable,"particularly when accompanied by an explanation for the findings.  *See Kepke,* 636

40

Fed App'x at 630.

A careful review of Dr. Syed's opinion reveals this form, while containing a series of checks, also contains specific functional limitations regarding Rueda's ability to sit, stand, and walk (including the amount of time each can be performed), the need for unscheduled breaks (including specific limits on how often and for how long), absences (listing the amount of days Rueda would likely be absent each month), the ability to lift (including the amount of weight which can be lifted), as well as specific postural limitations and manipulative limitations.  (Tr. 1743, 1744, 1745.)  While the opinion itself does not contain a great deal of explanation for these limitations, Dr. Syed submitted his treatment notes which contain detailed physical examinations of Rueda.  (Tr. 1399, 1401, 1759, 1755, 1751, 1747.)  These treatment notes also provide insight into the treatment of Rueda's conversion disorder.  (*Id*.)  Treatment, as discussed above, of which the ALJ mischaracterized and provided little discussion or analysis.

Moreover, the ALJ's finding that Dr. Syed's opinion was "generally inconsistent with the overall record" is not supported by substantial evidence.  Similar to her treatment of Dr. Nair's opinion, the ALJ generally cites to several treatment notes which indicated "normal gait, normal strength, normal range of motion, and lack of acute distress."  (Tr. 22.)  The ALJ again does not cite which treatment notes she is referencing to support her reasoning.  This is problematic because, as discussed above, the ALJ provided a sparse discussion and analysis of the extensive medical records and failed to acknowledge or address a litany of key pieces of evidence.  Moreover, within many of the treatment notes, Rueda had abnormal findings.  (Tr. 2120, 1935, 1931, 545, 973, 1399, 1917, 1443, 2206.)

Finally, the Court finds the ALJ mischaracterized Dr. Syed's recommendations Rueda

"should be exercising 30 minutes per day for 5 days every week,"when discounting the opinion. (Tr. 22.)  Dr. Syed provided this recommendation as treatment for his conversion disorder and somatization symptoms, stressing to Rueda it was "extremely important that during the exercise you regularly tell yourself(mentally or verbally) that you are exercising for the purpose of curing your symptoms."  (Tr. 1755.)  Rather than acknowledging Dr. Syed felt Rueda's conversion disorder warranted treatment, the ALJ suggested this recommendation was "inconsistent with the extreme limitations" in Dr. Syed's opinion.  (Tr. 22.)  The ALJ took this treatment recommendation out of context and, rather than discussing the somatization component of Rueda's impairments, used it to discredit Dr. Syed's opinion.

In sum, the ALJ's decision fails to set forth good reasons for discounting the opinion of Dr. Syed.  Accordingly, the Court recommends this matter be remanded to afford the ALJ an opportunity to sufficiently evaluate and explain the weight ascribed to the limitations assessed by Dr. Syed.

**B.      Record As a Whole/RFC**

In his first assignment of error, Rueda argues the "ALJ's decision was not based on the record as a whole and lacked the support of substantial evidence."  (Doc. No. 13 at 10.)  He asserts the ALJ "failed to find [his] fibromyalgia and conversion disorder severe or non-severe" and "failed to properly consider [his] multiple hospitalizations."  (*Id*. at 11, 13.)

The Commissioner argues while the ALJ did not discuss fibromyalgia or conversion disorder at step two, this is "harmless because the ALJ discussed these impairments and Plaintiff's impairment related complaints in the remainder of the decision."  (Doc. No. 14 at 11.)

It appears there is some confusion over the nature of Rueda's argument in his first

42

assignment of error.  In his Reply Brief, Rueda disputes that he is making a step two argument, asserting instead it is his "position that the ALJ's failure to properly evaluate fibromyalgia was a Step IV and Step V violation."  (Doc. No. 16 at 4.)  Since Rueda has specifically denied he is making an argument regarding the ALJ's step two findings, the Court will not address Rueda's fibromyalgia or conversion disorder in the context of a step two analysis.  Rather, Rueda asserts the ALJ's treatment of his fibromyalgia and conversion disorder impacted the ALJ's formulation of his RFC and weighing of the treating source opinions.  (Doc. No. 16 at 4.)  As this Court has previously discussed the ALJ's treatment of the treating physician opinions at length, the Court will now consider Rueda's first assignment of error in conjunction with his third assignment of error, as both involve the formulation of Rueda's RFC.

Specifically, in his third assignment of error, Rueda argues the "RFC was legally defective as it failed to properly consider all of Mr. Rueda's impairments; did not include absences from work and did not include the need of a cane or roller walker."  (Doc. No. 13 at 18.)  He asserts the ALJ failed to include the following limitations in the RFC: (1) "functional limitations supported by fibromyalgia, conversion disorder, and vertigo;" (2) "all the time off from work which would result from emergency room visits, hospital admissions, and nursing room stays;" (3) "Mr. Rueda's need for an assistive device such as a cane or walker;" and (4) "the safety limitation of no climbing or being near moving machinery."  (*Id*. at 19.)

The Commissioner asserts the ALJ "acknowledged [Rueda's] reports of using a cane and walker" but properly "found the use of a cane or walker was generally inconsistent with the record."  (Doc. No. 14 at 14.)  The Commissioner notes the "ALJ acknowledged that [Rueda] had been hospitalized for various reasons," arguing "Rueda does not cite any legal authority in

support of the argument the number of days hospitalized is determinative of disability."  (*Id*. at 13-14.)  The Commissioner also maintains "despite the lack of clinical findings to support a diagnosis of fibromyalgia, the ALJ considered [Rueda's] symptoms of pain and alleged limitations in assessing his RFC."  (*Id* at 13.)

 The ALJ is obligated to consider the record as a whole.  *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir.1985).  It is essential for meaningful appellate review that the ALJ articulate reasons for crediting or rejecting particular sources of evidence.  *Morris v. Sec'y of H.H.S.*, 1988 WL 34109, at *2 (6th Cir. April 18, 1988).  Otherwise, the reviewing court is unable to discern "if significant probative evidence was not credited or simply ignored."  *Id*. (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981)).  The ALJ need not provide a "written evaluation of every piece of testimony and evidence submitted.  However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position."  *Id*. (quoting *Cotter*, 642 F.2d at 705).  An ALJ "cannot 'pick and choose' only the evidence that supports his position." *Kester v. Astrue*, 2009 WL 275438, at *9 (S.D. Ohio Feb.3, 2009) (citing *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir.2000); *Switzer v. Heckler*, 742 F.2d 382, 385–86 (7th Cir.1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y.2002)).  However, an ALJ is not required to provide detailed evaluation of every piece of evidence contained within the record. Rather, the ALJ is charged with providing *minimal* articulation of their assessment of the evidence.  *See Morris,* 1988 WL 34109, at *2.

 "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision,

especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774

F.Supp.2d 875, 880 (N.D. Ohio 2011) (*citing Bryan v. Comm'r of Soc. Sec*., 383 Fed. App'x 140,

148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he

'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...]

contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7, 1996

SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source

opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator

must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine,

however, it is well established that the claimant bears the burden of establishing the impairments

that determine her RFC.  *See Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 391 (6th Cir. 1999).

      The RFC determination sets out an individual's work-related abilities despite his or her

limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an

administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An

ALJ "will not give any special significance to the source of an opinion on issues reserved to the

Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and

must consider all of a claimant's medically determinable impairments, both individually and in

combination, S.S.R. 96-8p.

      As the undersigned has recommended this matter be remanded for further consideration

of the opinions of treating physicians Drs. Nair and Syed, it is possible the ALJ's RFC

determination and her evaluation of the evidence may change on remand.  Thus, the Court will

not address all of the parties' arguments regarding the alleged deficiencies in the ALJ's

discussion of the medical evidence at step four.  On remand, however, it is recommended the ALJ conduct a thorough and complete review of the medical evidence relating to Rueda's impairments, including evidence relating to his conversion disorder, fibromyalgia,[9] vertigo, his multiple hospitalizations and emergency room visits, and multiple nursing home stays.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further proceedings consistent with this Report and Recommendation.


*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: June 22, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

[9]    The Court notes Rueda argues under Social Security Ruling 12-02p, an "ALJ is required to re-contact the treating doctor or request additional evidence" when there is "insufficient evidence to determine whether the claimant has fibromyalgia."  (Doc. No. 13 at 12.)  As the Commissioner correctly notes, there is no such requirement under Social Security Ruling 12-02p.  (SSR 12-2p, 2012 WL 3104869 at *4 (July 25, 2012).